Audrey Bride LISNER, Jacqueline Marie Lisner, and Jannette Alecia Lisner, Plaintiffs,

v.

CHICAGO TITLE AND TRUST COMPANY, as Trustee under Trust Number 47554, and Jack A. Coney, Defendants.

No. 77–1005.

United States District Court, S. D. Illinois, Northern Division.

Nov. 7, 1977.

---

**34.** *Blue Chip Stamps v. Manor Drugstores,* 421 U.S. 723, 739, 740, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975) (emphasis added).

Hamilton Smith and Mark L. Yeager, Chicago, Ill., Thomas B. Kennedy, Sr., Peoria, Ill., for plaintiffs.

Richard H. Radley, Charles G. Roth, Peoria, Ill., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

This complaint for declaratory judgment seeks to avoid the apparent legal consequences of a warranty deed, recorded in Woodford County, Illinois, which purports to have been executed by plaintiff Audrey Bride Lisner, hereinafter "Audrey."[1] The defendant, Chicago Title and Trust Compa-

ny, as Trustee, hereinafter "CT," is the grantee named in said deed. The defendant Coney is the beneficial owner of the trust estate therein represented. Jurisdiction is invoked under 28 U.S.C. § 1332, diversity of citizenship between the parties being alleged.

The complaint arises from the following facts. Audrey's uncle, Nicholas Bride, died, testate, on August 14, 1957, seized of the Woodford County real estate in issue. Under a codicil to his will, he devised the real estate to his brother, Isadore Bride, for life, and, successively, to Audrey for life, with remainder over to Audrey's children. That codicil provided that the realty be held in trust for Audrey until she reached her age of 25 years, should Isadore die before she reached that age. Continuing, the codicil gave to Audrey a power to convey the fee interest after "she shall have attained the age of twenty-five years and become entitled, also, to the income from such real estate." The warranty deed in issue, which recites that it is made pursuant to that power of sale, purports to convey the realty subject to the life estate in Isadore. It was recorded on December 10, 1964. Audrey attained her age of 25 years on July 4, 1962. Isadore is yet living, his age being approximately 96 years.

Defendants moved to dismiss the complaint upon the ground that it does not state any claim upon which relief can be granted. That motion is, in part, supported by affidavits as to facts outside the pleadings and therefore stands, under Rule 12(b), as a motion for summary judgment. Plaintiffs have filed a countermotion for a summary judgment declaring the deed void. The cause is now before the court upon those motions.

The complaint can be most intelligibly summarized by proceeding from a recital of the prayer for a declaratory judgment, alternatively:

a. That Audrey did not have the power to convey the real estate under the Will of Nicholas until after the death of Isadore,

---

1. The other plaintiffs are the minor children of Audrey.

and that therefore the recorded warranty deed is void; or

b. That the signatures on the recorded deed "are not genuine"; or

c. That Audrey "was overreached in transferring her interest in the property" and that the deed is voidable.

The body of the complaint must be characterized as evasive. It does contain the well-pleaded facts that Nicholas died seized of the real estate, that the codicil to his will created the successive life estates and the power of sale, that Audrey reached her age of 25 years on July 4, 1962, that Isadore is yet living, and that the minor plaintiffs are Audrey's only children, and that the challenged warranty deed was recorded on December 10, 1964. It further asserts the position that Nicholas, by the said codicil, intended that the power of sale could not be exercised by Audrey until the death of Isadore.

All other allegations are conclusive and evasive of any intelligible factual statement. Thus, it is alleged that Audrey "was overreached" by unidentified persons acting in concert with Coney in 1964, and that "she was persuaded to execute a quitclaim deed" conveying her interest in the realty to some person other than CT in exchange for the sum of about $12,000, which sum "represented a small fraction" of the then value of Audrey's interest, but that that deed was never recorded. It is further alleged that the recorded warranty deed "purports to have been signed by" Audrey, but "The signatures on the deed are not genuine."

It seems clear that the language of the complaint was designed to hint at the existence of some fraud and, potentially, the forgery of the recorded deed, although such accusations are not factually alleged. It seems equally certain that those allegations are wholly insufficient to state a fraud theory. If the complaint alone was before the court, dismissal is the indicated result. However, the complaint does not stand alone, and dismissal, though it be the easy course to follow, is not inclined to promote the achievement of justice.

In addition to the complaint, the court has before it affidavits and documentary evidence submitted in support of defendants' motion and certain depositions taken at the behest of plaintiffs. From these sources there emerges an uncontested factual picture as hereinafter narrated.

Nicholas executed a will in 1951. By the fifth clause of that will, he devised successive life estates to Isadore and Audrey. That clause also designated a trustee to manage the property for Audrey until she reached her age of 35 years, and created in her power to sell and convey the remainder interest after she reached her age of 50 years. The codicil, executed in 1953, deleted and replaced the fifth clause of the will. That codicil devised the real estate to Isadore for life and, successively, to Audrey for life, with remainder over to Audrey's children or, contingent upon there being no children, to the heirs of Nicholas. The codicil also contained the power of sale as above recited.

In November, 1964, Coney was approached by Henry B. Scherrer, a real estate broker in Peoria, Illinois, at which time Coney was advised that Audrey had employed Scherrer to sell her interest in the real estate and that John D. Thomason, who Scherrer described as Audrey's attorney, had suggested to Scherrer that Coney might be interested in buying. Scherrer also told Coney that he, Scherrer, was required to be absent from the area and was withdrawing from the sales listing, but that he would, if Coney desired it, show the property to Coney before leaving. Shortly thereafter, Coney, accompanied by Scherrer and Dr. J. P. Coney, Coney's father, did inspect the land. Coney then contacted Thomason and advised him that he, Coney, offered to purchase the realty for $13,500, subject to Isadore's life estate. Coney was told to contact a William V. Lowe, described as an agent for Audrey, at North Hollywood, California.

Coney advised Lowe by a telephone conversation of his offer to purchase. He was then told by Lowe that the matter would be referred to Audrey. On November 19,

1964, Coney received a handwritten letter from Audrey, dated November 17, 1964, stating, *inter alia*, that "I hereby approve the price of $13,500.00 as value in full for the remainder interest and fee title of the property," and that you may contact "Mr. John D. Thomason" to conclude the transaction.[2] Coney advised Thomason of the receipt of the letter and its contents, after which Coney and Thomason went to the office of CT to arrange for a title search and title insurance. When advised that CT required a copy of Audrey's birth certificate, Coney phoned Lowe. Thereafter, Audrey phoned Coney to advise him that the birth certificate was being mailed and that she approved the payment of the purchase price to Thomason, as her attorney. That certified copy, submitted with a brief handwritten note from Audrey, was received about November 26, 1964.

Upon receipt of the letter accepting the offer to purchase, Coney prepared a warranty deed for execution by Audrey, individually, and as attorney in fact for her estranged husband, conveying the premises to CT, as Trustee under Trust No. 47554. The prepared deed was delivered to Thomason for transmittal to his client. In early December, Coney was advised by Thomason that Audrey had stated to him, Thomason, that she would execute the deed and that the same would be personally delivered for her by Lowe to Thomason, at Peoria, for delivery at the time of closing.

On December 7, 1964, Coney met with Thomason, who was accompanied by a person then identified as Lowe, at the CT office. At that time, the deed, as recorded, was delivered to Coney in exchange for his check to Thomason, as attorney for Audrey, in the amount of $13,275.15, the net consideration after payment of costs of title insurance and documentary stamps. On December 10, 1964, the deed was recorded. Coney has never seen Audrey, and he met Lowe only at the time of closing.

Coney had never received any complaint from, or objection by, Audrey until a short time before January 14, 1977, the date upon which this complaint was filed.

Dr. Coney and Mr. Thomason are both now deceased.

The above recital of facts is taken largely from the affidavit of Coney and from exhibits thereto attached, including photocopies of the correspondence from Audrey, and of the cancelled check from Coney to Thomason, which was endorsed by Thomason, as attorney for Audrey, and presented for payment on the date which the same bears. Those facts are accepted as stating the factual background of this litigation, inasmuch as none are contested by any verified statement by Audrey or any other person. Indeed, in their most recent brief, plaintiffs seem to have abandoned their hints of fraud. Thus, plaintiffs now state that this case involves an "attempted execution" of a power before the power existed, and argue that "Audrey's attempted conveyance" is void.[3]

Against the factual background, the single issue, well pleaded, is the legal question

---

**2.** The full text of that letter follows:

November 17, 1964

Mr. Jack A. Coney, Esquire
First National Bank Bldg.
Peoria, Illinois

Re: Sale of Bride Farm

Dear Mr. Coney:
Having been informed, by Mr. Lowe, today of your conversations this date (November 17, 1964)
I would like to advise you of the following:
1. I hereby approve the price of $13,500.00 as value in full for the remainder interest and fee title of the property known as the Bride farm, located on Spring Bay Road.
2. I authorize you to make payment in the form of a cashiers check payable to Mrs. Au-

drey Bride Lisner and Mr. William V. Lowe, Trustee.
3. Mr. John D. Thomason, First National Bank Building, Peoria, Illinois has offered to be of assistance to you in opening the title search. You may contact him.
Mr. Lowe has spoken to Mr. Thomason this date November 16, 1964.
I have sent Mr. Thomason a letter this date authorizing his assistance.
Sincerely,
s/Mrs. Audrey Bride Lisner

**3.** There appears some indication that the ephemeral hints at fraud were designed to bridge any eventuality which prosecution of the complaint might produce. At an earlier stage of briefing, plaintiffs suggested that similarities between the handwriting of one Linda

whether the warranty deed delivered by Audrey did effectively convey the realty to Coney subject to Isadore's life estate. Decision of that question depends upon a determination as to the estate and interests created by the Nicholas will and a further determination as to the legal effect of Audrey's attempted conveyance of her interest during Isadore's lifetime.

The intent of the testator under the codicil appears reasonably clear. His will created the following interests:

a. A life estate in Isadore;

b. A successive life estate in Audrey, with her beneficial right of possession deferred until termination of the primary life estate; and

c. A remainder in fee to designated classes of persons, alternatively, which was subject to Audrey's power to convey the whole remainder interest after the life estate to Isadore.

■ Upon admission of the will to probate, Audrey had a vested remainder in her life estate. *E. g., Wills v. Southwell*, 334 Ill. 448, 166 N.E. 70 (1929); *St. Louis Union Trust Co. v. Hearne*, 111 Ill.App.2d 411, 250 N.E.2d 674 (5th Dist. 1969). Vested remainders are alienable under Illinois law. *E. g., Friedman v. Friedman*, 283 Ill. 383, 119 N.E. 321 (1918).

Plaintiffs do not challenge those legal principles. Nor do they challenge the further principle that the power in Audrey to convey the fee interest was a power appurtenant to Audrey's vested remainder. *E. g., Rock Island Bank and Trust Co. v. Rhoads*, 353 Ill. 131, 187 N.E. 139 (1933); *Boyle v. Moore*, 299 Ill. 571, 132 N.E. 761 (1921); *Wallace v. Foxwell*, 250 Ill. 616, 95 N.E. 985 (1911). What they do contend is that the power appurtenant could not come into being until the primary life estate in Isadore was terminated.

A certain amount of ambiguity does pervade the expression of intent contained in the will. By clause Fifth of his will, executed in 1951, Nicholas devised a life estate to Isadore and, "subject to * * * terms and conditions hereinafter set forth," a successive life estate to Audrey, with remainder over to Audrey's children. Such terms and conditions included the designation of a trustee to manage the real estate "after the death" of Isadore until Audrey "has attained the age of Thirty-five years," and the provisions that Audrey, "after she shall have attained the age of fifty years," shall have full power and authority to sell and convey all or any part of the real estate.[4]

The codicil, executed in 1953, follows the same general pattern of devises, i. e., a life

---

Chase, a former Coney secretary, and the "Audrey" signatures suggest that the "Audrey" signatures on the warranty deed could have been signed by Mrs. Chase. That suggestion was met by the affidavit of Mrs. Chase that she was born December 16, 1951, that she was 12 years of age on the date which the deed bears, and that she first met Coney and was employed by him in May of 1971. By the latest memorandum, plaintiff now abandons that suggestion, though they yet state that the noted similarities do suggest the possibility that the warranty deed may have been forged. That "suggestion" is rejected without further comment.

In similar vein, in response to interrogatories, Audrey stated in effect that she does not know the identity of persons who contrived with Coney to "overreach" her, but she believes that such persons may have been Scherrer, Thomason, and Dr. Coney. She further states that "she believes" that Mr. Thomason may have been the drawer of the check for about $12,000, which she is alleged to have received.

The court can only rely upon plaintiff's most recent statement of position, and does construe

their position to be limited to an allegation that Audrey attempted to exercise a power which did not exist until after the death of Isadore. This comment, made advisedly, rests upon the fact that plaintiffs, being faced with verified factual statements as to the total transaction, have come forward with not a single provable fact having any tendency to support a fraud theory.

4. "FIFTH: I give to my said brother, Isadore J. Bride, for and during the term of his natural life, the following described real estate, to-wit: North Half of the Northeast Quarter; and North Half of the Northwest Quarter; and the North Twenty-six rods off of the east One Hundred and Twenty rods of the South Half of the Northeast Quarter; all in Section Twenty-four, in Township Twenty-seven North, Range Four West of the Third Principal Meridian, in Woodford County, Illinois, during which time he shall be entitled to the net income from said real estate and, from such income, shall pay all taxes, insurance, necessary repairs, etc, thereon.

estate to Isadore, a successive life estate to Audrey, and a power of sale in Audrey. The "terms and conditions" were prefaced, as were those in the original will, by reference to a time frame "after the death of" Isadore. It designated a trustee to manage the realty until Audrey "shall have attained the age of twenty-five years," at which time she would become entitled to receive the income from the land directly. The power of sale is created in that context, in the pertinent language as follows:

"After [Audrey] shall have attained the age of twenty-five years and become entitled, also, to the income from such real estate, said [Audrey] shall have full power and authority to sell, dispose of and convey all or any part or parts of said real estate at any time or times and the purchaser or purchasers thereof shall not be required to look to the application of the proceeds of such sale, but shall take full and complete title by deed or deeds from my said niece. In the event of any such sale or sales by her, my said niece shall be entitled to the proceeds of such sale or sales without any further accounting therefor. * * *." [5]

The dispositional provisions of both the original will and the codicil reflect the tes-

---

"Subject to such life estate and subject to all of the terms and conditions hereinafter set forth, I give said described real estate to my said niece, Audrey Jean Bride, for and during her lifetime, with remainder to her child or children (either natural or adopted) and their heirs.

"Such terms and conditions are as follows: After the death of said Isadore J. Bride and until said Audrey Jean Bride has attained the age of thirty-five years, said real estate shall be managed and looked after for her benefit by Thomas Lindsey, of Clinton, Illinois, who shall collect the income from such real estate, apply the same in payment of the necessary expenses in connection with such property, including taxes, insurance, repairs, etc, and pay the net income from such real estate over to the said Audrey Jean Bride. After she becomes entitled to receive the income from such real estate herself, she shall pay all such expenses in connection with the proper maintenance and upkeep of such property and keep said premises in a proper state of repair. After she shall have attained the age of fifty years, said Audrey Jean Bride shall have full power and authority to sell, dispose of and convey all or any part or parts of said real estate at any time or times and the purchaser or purchasers thereof shall not be required to look to the application of the proceeds of such sale, but shall take full and complete title by deed or deeds from my said niece. In the event of any such sale or sales by her, my said niece shall be entitled to the proceeds of such sale or sales without any further accounting therefor.

"In the event of the death of said Audrey Jean Bride without leaving any child or descendant thereof, then I give such real estate that might otherwise pass to her child or children to those persons who would be my heirs at law determined as though my death should have occurred at the time of the death of said Audrey Jean Bride."

**5.** The codicil provided, in pertinent part:

"I, NICHOLAS BRIDE, of Metamora, Illinois, make and publish this as a Codicil to the Will made by me on August 30, 1951:

"I hereby revise the Fifth Clause of said will so as to delete such Fifth Clause from said will, as it was written, in its entirety and by inserting and putting in its place the following clause, which shall then be the Fifth Clause of my Will, to-wit:

"FIFTH: I give to my said brother, Isadore J. Bride, for and during the term of his natural life, the following described real estate, to-wit:
(Legal description omitted)
during which time he shall be entitled to the net income from said real estate and, from such income, shall pay all taxes, insurance, necessary repairs, etc, thereon.

"Subject to such life estate and subject to all of the terms and conditions hereinafter set forth, I give said described real estate to my niece, Audrey Jean Bride, for and during her lifetime, with remainder to her child or children (either natural or adopted) and their heirs.

"Such terms and conditions are as follows: After the death of said Isadore J. Bride and until said Audrey Jean Bride shall have attained the age of twenty-five years, said real estate shall be managed and looked after for her benefit by Cletus Bride, of Washington, Illinois, who shall collect the income from such real estate, apply the same in payment of the necessary expenses in connection with such property, including taxes, insurance, repairs, etc, and pay the net income from such real estate over to the said Audrey Jean Bride. After she becomes entitled to receive the income from such real estate herself, she shall pay all such expenses in connection with the proper maintenance and upkeep of such property and keep said premises in a proper state of repair. After she shall have attained the age of twenty-five years and become entitled, also, to the income from such real estate, said Audrey Jean Bride shall have full power and authority to sell, dispose of and convey all or any part or parts of said real estate at any time or times

tator's awareness of the disparity in age between Isadore and Audrey. When the original will was executed, Isadore was already past seventy years of age and Audrey was fourteen. When the codicil was executed, Audrey was less than sixteen years of age. In both documents the expectation that Isadore would not live until Audrey had attained what the testator deemed to be an age of discretion is reflected in the designation of a trustee to manage the real estate for Audrey's benefit. Initially, that age of discretion was deemed to be thirty-five years and, laterally, the age of twenty-five years. It is clear that the objects of testator's bounty were Isadore and Audrey, the former for the enjoyment of the property for his life and the latter for the enjoyment of the full beneficial interest in the remainder after Isadore's life estate.[6]

The genesis of the power to convey the fee was expressly fixed at the time of Audrey's reaching fifty years of age, by the original will. That same power was given to Audrey by the codicil after she should attain her age of twenty-five years and "also" become entitled to the income from the real estate.

In the context of the conditions stated in the codicil, it does appear that the "also" clause was a mere recital of a course of events as Nicholas anticipated them then, i. e., that Isadore would not live until Audrey attained her age of twenty-five. That apparent intention seems further manifested by the language used in the grant of the power that Audrey had the power to sell "all" of said real estate and that any purchaser would "take full and complete title" by a deed from Audrey. That direction could not possibly prevail so long as Isadore

lived without impinging upon his life estate. Yet, the "also" clause cannot be ignored, since it is couched in the phraseology of a possible limitation on the power within the testator's intention. Though one must question whether the testator did intend the clause as a limitation upon the power, it may nevertheless reasonably be so construed.

On that basis, the crucial question is whether the power could be effectively exercised by Audrey before one stated condition for its exercise is realized.

■ Although no Illinois decision precisely in point is found, the answer to that question must be affirmative.

A somewhat similar situation was before the Illinois Supreme Court in the recent case of *Rosenthal v. First National Bank of Chicago*, 40 Ill.2d 266, 239 N.E.2d 826 (1968), which involved the question whether a secondary life tenant having a power to appoint the remainder could legally exercise the power before the expiration of the primary life estate. The court held that it was immaterial whether the appointment occurs before or after termination of the primary life estate, and that the appointee under the power takes as a remainderman, with enjoyment and possession deferred pending determination of the primary estate. Among other cases, the court cited *Cowman v. Classen*, 156 Md. 524, 144 A. 367 (1944).

*Cowman* involved a life estate to A, a successive life estate to B, and a testamentary power in B to appoint the remainder in fee. B predeceased A and exercised the power of appointment by her will. The court stated that a power which is dependent on a contingent event may be exercised

and the purchaser or purchasers thereof shall not be required to look to the application of the proceeds of such sale, but shall take full and complete title by deed or deeds from my said niece. In the event of any such sale or sales by her, my said niece shall be entitled to the proceeds of such sale or sales without any further accounting therefor. This power shall not give my said niece the right or authority to mortgage or create any lien on said real estate.
"In the event of the death of said Audrey Jean Bride without leaving any child or de-

scendant thereof, then I give such real estate that might otherwise pass to her child or children to those persons who would be my heirs at law determined as though my death should have occurred at the time of the death of said Audrey Jean Bride."

6. It appears from a certified copy of the Inheritance Tax Return filed in the Nicholas Bride estate that the probate court did assess tax upon the various interests as being a life estate to Isadore and the remainder after that life estate to Audrey.

before the occurrence of the contingency, and that such exercise of power is effective upon the occurrence of the contingency. To the same effect is the statement by the Supreme Court of Virginia that a contingent power may be exercised before the contingency happens. The existence of the contingency merely delays the effect of its exercise. *Machir v. Funk*, 90 Va. 284, 18 S.E. 197 (1893).

The testator's dispositional scheme is fully carried out by sustaining the exercise of the power in this situation. He created a life estate in Isadore which is not affected by the transaction. He created a vested life estate in Audrey, with enjoyment deferred, coupled with a power in her to sell and convey the remainder after her life estate for her use and benefit. Audrey obtained the monetary benefit of her remainder interest, at a sale price which she expressly approved in writing, under circumstances almost precluding anything approaching "overreaching." Her exercise of the power conveyed to Coney her remainder interest after the life estate to Isadore.

■ Despite the protestations of Audrey that she "thinks" she signed a quit claim deed, it cannot be considered as disputed that the warranty deed, as reflected in an exhibit to the complaint, is the document which Audrey executed. The affidavit of Coney, and exhibits attached thereto, presents a verified statement of a sequence of events which remain wholly unrefuted. These commence with Scherrer's initial contact with Coney and continue through Coney's offer to purchase, Audrey's written acceptance of that offer and Audrey's designation of Thomason to represent her, to the payment of a valuable consideration by Coney and his acceptance and recording of the instrument.

■ It is clear that plaintiffs are estopped by the covenants of warranty in the deed from bringing this action. Section 9 of the Illinois Conveyances Act provides that any warranty deed which is substan-

tially in the statutory form therein provided warrants to the grantee the quiet and peaceable possession of the premises, and that the grantor will defend the title thereto against all persons who may lawfully claim the same. Ill.Rev.Stat.1975, c. 30, § 8.

A full exposition of the legal effect of covenants of warranty under the statute is found in *Biwer v. Martin*, 294 Ill. 488, 495–497, 128 N.E. 518 (1920). The court there states the following guiding principles:

a. Covenants of warranty are synonymous with covenants of quiet enjoyment, and the same constitute covenants that the grantor and his heirs are forever barred from claiming the estate and that they will defend the title when it is assailed by a claim of paramount title;

b. Covenants of warranty by estoppel operate to convey after-acquired title;

c. A grantor in a warranty deed is not permitted to attack a title the validity of which he has covenanted to maintain;

d. Covenants of warranty apply with equal force whether a deed conveys a present or a future interest; and

e. That covenants of warranty are obligatory upon the heirs, personal representatives and assigns of the grantor.

The deed in issue substantially followed the statutory form. It bears the signature "Audrey Jean Bride Lisner," individually and as attorney in fact for her estranged husband. It bears the standard acknowledgment before Elvin F. Skaggs, a notary public for Los Angeles County, California. After specifically describing the real estate, the document recites that it is made:

"Subject to outstanding life estate in Isadore J. Bride under the terms and provisions of the Last Will and Testament and Codicil of Nicholas Bride, deceased. This conveyance is made pursuant to the power and authority contained in the said Will of Nicholas Bride, deceased."

Applying the above statute, as interpreted by the courts of Illinois, plaintiffs cannot

refute the covenants of warranty made by Audrey and maintain this cause of action against these defendants.[7]

The delay of more than twelve years before filing this complaint is both cited to the court by defendants and noted by the court. The full implication of such delay bears more critically upon the "hinted at" claims than it does on the question of the validity of the exercise of the power. Thus, it is not deemed necessary to further consider the matter.[8]

No genuine issue of fact material to the legal issues before the court do exist, and defendants are entitled to judgment as a matter of law.

Accordingly, IT IS ORDERED that plaintiffs' motion for summary judgment is DENIED. IT IS FURTHER ORDERED that defendants' motion for summary judgment dismissing the complaint is ALLOWED, plaintiffs to bear the costs of suit.

---

**7.** Plaintiffs do assert the obvious fact that defendants had knowledge of the provisions of the Nicholas Bride will, and they argue that defendants were chargeable with notice in 1964 that Audrey did not then have the power to convey. Their argument ignores the fact that Audrey was possessed by like knowledge and is chargeable with like notice. The reasonable implication of the circumstances is that all parties then acted under their mutual understanding that Audrey did have power to convey. If that reasonable implication is to be avoided, then that avoidance would raise the serious difficulty of Audrey now explaining why she accepted $13,500 for a warranty deed which she then knew to be a nullity.

**8.** The court has no difficulty in entering a summary judgment for the defendants upon the merits of the issue of the validity of Audrey's exercise of the power to convey. A certain difficulty does arise if that judgment be construed to embrace the merits of other peripheral issues which are only suggested by, but not adequately pleaded in, the complaint. Thus, further pursuit of litigation is not necessarily completely foreclosed by the court's judgment order.

It seems appropriate to comment, however, that it would appear to be extremely difficult to fashion any complaint which could, first, overcome the evidentiary materials now before the court, and, secondly, display with any conviction why the statutes of limitation or the doctrine of laches, or both, would not condemn any such complaint to abject failure.